## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

STATE OF NEW MEXICO, *ex rel.* RAÚL
TORREZ, ATTORNEY GENERAL,

     Plaintiff,

v.                                                    Case No.

JOGAN HEALTH, LLC, and DAN
DIETRICH, individually and as Sole Owner
and CEO of Jogan Health, LLC,

     Defendants.

### VERIFIED COMPLAINT FOR BREACH OF CONTRACT, UNJUST ENRICHMENT, FRAUD, CONSTRUCTIVE FRAUD, NEGLIGENT MISREPRESENTATION, PRIMA FACIE TORT, VIOLATION OF FRAUD AGAINST TAXPAYERS ACT AND RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT VIOLATIONS

**COMES NOW,** Plaintiff, the State of New Mexico, by and through its Attorney General Raúl Torrez and Edward Marshall, ("New Mexico" or the "State"), and by and through its counsel of record, NMDOH Office of General Counsel and Robles, Rael & Anaya, P.C. (Marcus J. Rael, Jr. and Phoebe J.W. Roderick), and hereby presents its Verified Complaint for Breach of Contract, Breach of the Duty of Good Faith and Fair Dealing, Unjust Enrichment, Actual Fraud, Constructive Fraud, Negligent Misrepresentation, Prima Facie Tort, Violation of the Fraud Against Taxpayers Act ("FATA"), and Racketeering in Violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act against Jogan Health, LLC ("Jogan") and Dan Dietrich, in his individual and official capacities. In support of its Complaint, NMDOH states:

### NARRATIVE SUMMARY OF COMPLAINT

SARS-CoV-2 (hereinafter "COVID-19") was discovered in December 2019 in Wuhan, China where patients began to experience the symptoms of an atypical pneumonia-like illness that did not respond well to standard treatments. By January 19, 2020, 282 laboratory-confirmed cases of COVID-19 had been reported in four countries. One day later, on January 20, 2020, the Center for Disease Control and Prevention (*hereinafter* "CDC") reported the first laboratory-confirmed case of COVID-19 in the United States. On January 31, 2020, pursuant to section 319 of the Public Health Service Act, the United States Secretary of Health and Human Services declared a Public Health Emergency as of January 27, 2020, in response to the virus's aggressive spread throughout the country. On March 11, 2020, after more than 118,000 cases were reported in 114 countries and 4,291 deaths, the World Health Organization (hereinafter "WHO") declared COVID-19 a global pandemic. By June 10, 2020, the number of confirmed COVID-19 cases in the United States surpassed 2 million. Soon after, on June 30, 2020, the Director of the National Institute of Allergy and Infectious Diseases, Dr. Anthony Fauci, testified at a Senate committee hearing that the number of new COVID-19 cases in the United States could soon rise from 40,000 to 100,000 new infections every day, likely overwhelming an already burdened healthcare system. Within ten months of COVID-19 appearing, in late September 2020, the reported death toll from COVID-19 reached more than 1 million worldwide and surpassed 200,000 in the United States alone. On November 4, 2020, the United States reported 100,000 new cases of COVID-19 within a period of 24 hours.

The immense spread of COVID-19 combined with the massive number of new daily cases placed a significant burden on New Mexico's healthcare systems. Indeed, since March 11, 2020—

the date of the first reported case of COVID-19 in New Mexico—New Mexico saw over 700,000 cases of COVID-19 resulting in more than 34,000 individuals being hospitalized. As a byproduct of the vast number of increased hospitalizations, New Mexico's medical providers soon found themselves severely understaffed. To address New Mexico's medical staffing crisis, NMDOH entered Contract No. 665-22-24053 (the "Contract") with Defendant Jogan on October 22, 2021. The purpose of this Contract was to provide temporary Healthcare Practitioner and Support Service Provider Staffing to NMDOH for deployment at participating healthcare facilities, including but not limited to hospitals and in-patient nursing or rehabilitation facilities, in an effort to combat the devastating effects confronted by New Mexicans in the face of COVID-19.

Throughout the period of the Contract, Defendant Jogan repeatedly positioned itself to benefit at the expense of NMDOH through haphazard, unsubstantiated, and frequently predatory billing practices. COVID-19's creation of a desperate need for health care providers in New Mexico placed NMDOH in the untenable position of choosing whether to risk New Mexicans losing critically-needed medical care by immediately disputing all Jogan's improperly calculated invoices or simply paying the invoices with the hope that NMDOH and Jogan could resolve any discrepancies amicably per the Contract when decisions surrounding paying invoices did not potentially risk the lives of the people that NMDOH is responsible for protecting.

Defendant Jogan's indiscriminate and predatory billing practices first came to light when NMDOH received invoices including overtime hours, which was not permitted by the Contract. In May and June 2022, both parties engaged in written and verbal discussions establishing that NMDOH would not be paying Jogan providers for overtime because the Contract provided that NMDOH would be paying a flat hourly rate to Jogan which, in turn, would be responsible for

paying its providers any overtime due. This understanding was recognized by both parties, and Defendant Jogan revised its invoices and resubmitted them without the originally billed overtime hours. NMDOH promptly paid the revised invoices. In March 2022, Jogan Health providers were demobilized in New Mexico due to the decreased need for supplementary medical providers.  Soon thereafter, NMDOH sought to investigate Defendant Jogan's billing discrepancies. To determine the extent of Defendant Jogan's billing discrepancies, NMDOH sought the assistance of a forensic accountant to analyze the Contract and determine whether Jogan's invoices complied with the terms agreed to by the parties.

Over one year after demobilizing from New Mexico, on June 15, 2023, NMDOH received a letter from Jogan demanding payment for $17,100,502.35 of overtime wages.

NMDOH's investigation into the invoices submitted by Defendant Jogan revealed a far-reaching, coordinated pattern of fraudulent invoices unlawfully syphoning millions of dollars from New Mexico for services never provided to the people of this State. Shockingly, the millions of dollars unlawfully pilfered from the pockets of New Mexico taxpayers were not enough for Defendants to call it a day and move on to their next endeavor. Instead of attempting to peacefully slip away before all of its fraud was detected, Defendant Jogan attempted to obtain one last massive paycheck before it lost the ability to capitalize on the deaths and fear caused by the COVID-19 health crisis by fleecing the coffers of not only the State of New Mexico, but upon information and belief, also other states desperate for healthcare workers. By sending a demand letter for over $17 million to NMDOH, with the threat of legal action should NMDOH not immediately pay the full amount, Defendant Jogan sought to force NMDOH to comply with its extortionate demand out of fear of what could happen to the people of New Mexico if NMDOH did not comply.

4

The egregious nature of Defendants Jogan and Dan Dietrich's actions during a national emergency, the constant and overt violations of the terms of the Contract through intentional or reckless disregard for the accuracy of invoices sent to NMDOH, and the blatant greed in seeking more than an additional $17 million after already receiving millions of dollars over what was contracted for, illustrates the duplicitous, self-interested nature of Defendants' interactions with NMDOH throughout the term of the Contract.

### JURISDICTION AND PARTIES

1. The New Mexico Department of Health is a Department created under the executive branch of the State, *see* N.M. STAT. ANN., § 24-1-3 (2017), and a governmental agency of the State of New Mexico as defined in N.M. STAT. ANN., §§ 13-1-90 (1984) and 44-9-2(F) (2015).

2. At all material times, Defendant Jogan was a Colorado limited liability company with its principal office located at 204 Green Valley Circle, Castle Pines, Colorado 80108.

3. Defendant Dan Dietrich is a Colorado resident and, during the Contracted period, was engaged in the business of owning, operating, managing, administrating, supervising, and/or maintaining Jogan as sole owner and President. He is sued in his individual and official capacities.

4. Defendant Dan Dietrich was responsible for the development of all policies and procedures pertaining to contract compliance and was responsible for ensuring appropriate oversight for contract compliance.

5. Whenever the term "Defendants" or "Jogan" is utilized within this suit, such term collectively refers to and includes all named Defendants in this lawsuit.

6. Defendant Dan Dietrich's intentional choice to form Jogan as a limited liability company was to create a separate legal entity from himself.

7.  The majority of work performed under the Contract was completed in the State of New Mexico.

8.  Defendants Dan Dietrich and Jogan pursued a contract with NMDOH in the hopes of financial profit for services provided in the State of New Mexico.

9.  In Contract No. 665-22-24053, Paragraph 27, the Parties agreed that "the laws of the State of New Mexico shall govern this Agreement, without giving effect to its choice of law provisions. Venue shall be proper only in a New Mexico Court of competent jurisdiction in accordance with N.M. STAT. ANN., Section 38-3-1(G)."

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00, exclusive of attorneys' fees. Diversity of citizenship exists because Plaintiff is the State of New Mexico and Defendants are citizens of Colorado.

11. Personal jurisdiction over Defendants is proper. Defendants have agreed to submit to the jurisdiction of this Court because they agreed that all actions brought under the contract shall be brought in a court of competent jurisdiction in the State of New Mexico and, as alleged below, Defendants conducted business in New Mexico and the harm caused by Defendants occurred in this State.

12. Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because Plaintiff is situated in this District, a substantial part of the events giving rise to the claims herein occurred in this District, and Defendants have agreed to submit to the personal jurisdiction of appropriate courts located in New Mexico.

GENERAL FACTUAL ALLEGATIONS

**A.  Contract and Contract Terms**

13. On October 22, 2021, NMDOH and Jogan executed Contract No. 665-22-24053.

14. Contract No. 665-22-24053 was subsequently amended two (2) times. First, on December 28, 2021, Contract No. 665-22-24053 A.1, and second on February 25, 2022, Contract No. 665-22-24053 A.2 (collectively the "Contract") Contract No. 665-22-24053 and the two (2) amendments are attached hereto respectively as **Exhibit 1**, **Exhibit 1A**, and **Exhibit 1B**.

15. The Contract provides an hourly rate for what is referred to as "Providers" or "Service Providers." **Exhibit 1**, p. 8.

16. The Providers and Service Providers were not employees of NMDOH; instead, they were employees or independent contractors of Defendant Jogan.

17. The Contract's Scope of Work (Section 2) provides for five (5) tasks. Most relevant to the dispute at hand is Task 5.

18. Task 5 indicates that "in addition to payment for hours worked, [NMDOH] shall pay [Jogan] for certain hours not worked by a Practitioner[.]" More specifically, Task 5 is broken down into five (5) subsections including: 1) Stand-Down Pay; 2) Guaranteed Weekly Pay; 3) Quarantine Pay; 4) Monthly Hourly Rate Reviews; and 5) Travel and other Expenses. **Exhibit 1**, pp. 6–8.

**1.  Stand-Down Pay**

19. The Contract's Stand-Down Pay subsection allows Jogan to invoice NMDOH for no more than 56 hours of Stand-Down Pay *per provider* for providers who deployed to New Mexico and had to wait for facility assignments. **Exhibit 1**, p. 6.

20. Defendant Jogan invoiced NMDOH for Stand-Down Pay for at least one provider who was not credentialed to provide medical services in New Mexico at the time of deployment.

21. A provider without proper credentials in New Mexico could not properly "wait for facility assignments" in New Mexico. Such an individual was not eligible for assignment.

22. The February 25, 2022, Contract amendment, **Exhibit 1B**, was executed in response to Defendant Jogan's bills for Stand-Down Pay for a non-credentialed medical provider who could not provide services in New Mexico.

23. Rather than engaging in an extensive dispute with Jogan about placing a non-credentialed provider in the state, New Mexico worked with Jogan, paid the invoice, and negotiated a Contract amendment to prevent Jogan from being able to bill for services not provided—such as sourcing a medical provider not legally authorized to practice in New Mexico.

24. Throughout the Contract, in violation of its terms, Defendant Jogan improperly invoiced NMDOH for Stand-Down Pay for forty-two (42) separate providers in excess of the allowed fifty-six (56) hours.

25. Defendant Jogan submitted invoices for a total of 2,600 hours of unauthorized Stand-Down Pay to NMDOH for a total of $614,512.00.

### 2. Guaranteed Weekly Pay

26. The Contract's subsection for Guaranteed Weekly Pay provides that "[f]or each Practitioner who has, in fact, been deployed for Assignment, [Jogan] shall have the right to invoice [NMDOH] for the greater of (i) 'Guaranteed Weekly Pay' or (ii) the actual number of hours worked by such practitioner. Guaranteed Weekly Pay shall be calculated by multiplying the

applicable Practitioner's Hourly Rate by twelve (12) hours for up to four days per week" for a total of 48 hours.  **Exhibit 1**, pp. 6–7.

27.  NMDOH acknowledges that other provisions of the Contract indicate that the guaranteed weekly pay consists of five (5) 12-hour days for a total of 60 hours.

28. The forensic accountant employed by NMDOH to review Jogan's invoices revealed that Defendant Jogan improperly billed $324,038.00 for guaranteed weekly pay for individuals who worked more than 60 hours per work week, in violation of even the most liberal reading of the Guaranteed Weekly Pay provision.

### 3.  Quarantine Pay

29. The Contract allows Jogan to invoice NMDOH for no more than 40 hours for Quarantine Pay per provider, stating:

> In the event a Practitioner is required . . . to quarantine as a consequence of being exposed to, being infected with, or suffers from, a virus, disease, or an infection, while performing Services pursuant to this Contract, Contractor may invoice . . . up to five (5), eight (8) hour days ("Quarantine Pay") for each such Practitioner required to quarantine. If the Practitioner is required to quarantine for more than five (5) days, [NMDOH] *shall not be required to pay for any additional Quarantine Pay*.

**Exhibit 1**, p. 7 (emphasis added).

30. In violation of the contract, Defendant Jogan invoiced NMDOH for eight of Jogan's providers who received quarantine pay on more than one occasion, of which three individuals received more than forty (40) hours of quarantine pay.  This included 56 unallowed hours totaling $14,784.00.

### 4. Travel Expenses

31. The compensation payable under the Contract is inclusive of all medical service providers' "inbound and outbound travel, lodging, and other expenses [Jogan] may incur in the performance of this Contract." **Exhibit 1**, pp. 7–8.

32. The compensation payable under the contract is also inclusive of per diem for the medical service providers.

33. The Contract does separately provide that "[d]aily transportation to/from site and hotel will be billed accordingly based on the needs of each site." **Exhibit 1**, p. 8.

34. The "travel and other expenses" invoiced by Defendant Jogan and paid by NMDOH exceeded the amount authorized by the contract by $3,622,081.79.

35. Defendant Jogan improperly invoiced NMDOH for services and expenses, including booking and coordinating travel, transporting medical service providers to and from the airport, and for incidental expenses such as food runs and shopping.

### COUNT 1: BREACH OF CONTRACT

36. Plaintiff incorporates Paragraphs 1–36 as if the same were fully stated herein.

37. The Contract is a valid and binding contract between Plaintiff and Defendant Jogan.

38. In addition to the amounts described above, Defendant Jogan's invoices claimed amounts that were not properly supported by timesheets in the amount of $378,882.00.

39. Defendant Jogan breached the Contract by requiring and accepting payment in the amount of $614,512.00 from Plaintiff for Stand-Down Pay more than the amount permitted by the Contract.

40. Defendant Jogan breached the Contract by requiring and accepting payment in the amount of $14,784.00 from Plaintiff for Quarantine Pay in excess of the amount allowed by the Contract.

41. Defendant Jogan breached the Contract by requiring and accepting payment in the amount of $324,038.00 from Plaintiff for Guaranteed Weekly Pay more than the amount allowed by the Contract.

42. Defendant Jogan breached the Contract by requiring and accepting payment in the amount of $3,622,081.79 from Plaintiff for Travel and Other Expenses in excess of the amount provided by the Contract.

43. Defendant Jogan acted with bad faith and reckless disregard for the interests of Plaintiff; therefore, Plaintiff is entitled to an award for actual damages of $4,954,297.79.

### COUNT II: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

44. Plaintiff incorporates Paragraphs 1–44 as if the same were fully stated herein.

45. Defendant Jogan entered into an express agreement with Plaintiff to both provide and charge for services as delineated in the Contract.

46. Parties to a contract are bound by the implied covenant of good faith and fair dealing to avoid injuring the rights of other parties to the contract through a party's effort to receive the benefit of the agreement.

47. Defendant Jogan accepted its duty of good faith and fair dealing with Plaintiff upon executing the Contract.

48. Defendants had an opportunity to obtain clarification on any contract term that presented any confusion.

49. Defendant Jogan negligently and intentionally submitted invoices to Plaintiff for millions of dollars of services not contemplated by the Contract or provided by Defendant Jogan.

50. By submitting myriad fraudulent or erroneous invoices to Plaintiff without verifying that the invoices complied with the Contract, Defendant Jogan sought to receive the benefit of the Contract in a manner that injured Plaintiff.

51. Defendant Jogan breached its duty of good faith and fair dealing with Plaintiff, causing actual damage to Plaintiff in the amount of $4,954,297.79.

52. As a result of Defendant Jogan's blatant disregard for its duty of good faith and fair dealing with Plaintiff, Plaintiff is entitled to an award of all allowable damages.

### COUNT III: UNJUST ENRICHMENT

53. Plaintiff incorporates Paragraphs 1–53 as if the same were fully stated herein.

54. Plaintiff asserts this cause of action for the restitution of payments that Jogan received as a direct result of its haphazard and inaccurate billing practices.

55. Defendant Jogan billed Plaintiff for services and expenses well over the contracted amount for the services and expenses actually incurred or allowed by the Contract.

56. As a result of Defendant Jogan's numerous excessive and inaccurate billing statements, Plaintiff unwittingly conferred excessive payments upon Defendant Jogan.

57. By retaining the full amount paid by Plaintiff for its unscrupulous billing practices, Defendant Jogan was unjustly enriched.

58. Defendant Jogan continues to retain the benefit conferred upon it by Plaintiff.

59. As a result of Defendant Jogan's continued and unlawful retention of the benefit bestowed upon it, Plaintiff has suffered actual damages of $4,954,297.79.

60. Plaintiff is entitled to recover the actual damages suffered as a result of Defendant Jogan's actions.

61. A constructive trust is appropriate to prevent the unjust enrichment resulting from a person being permitted to retain property obtained through wrongful conduct.

### COUNT IV: FRAUD

62. Plaintiff incorporates Paragraphs 1–62 as if the same were fully stated herein.

63. Actual fraud occurs when there is a misrepresentation of fact—known to be false by the maker of the misrepresentation—that is made with the intent to deceive and induce the other party to act in reliance, and actually rely, on the misrepresentation to his or her detriment.

64. The Contract details the services and expenses that Defendant Jogan was authorized to provide and receive payment for.

65. Defendants had a duty to be familiar with the terms of the contract.

66. Defendant Jogan misrepresented the amount of expenses and types of services provided to Plaintiff with the intention of receiving higher amounts than the Contract allows for the services provided. Examples of this intentional fraudulent invoicing practice include, but are not limited to:

    a.  Defendants submitted invoices that included 2,600 hours of Stand-Down Pay that was not permitted by the contract, knowing that the State would have to conduct an expensive and exhaustive analysis to uncover these excesses.

    b.  Jogan invoiced the State for disallowed and/or unsupported "transportation" costs including a $975 "flat rate" for transportation, in addition to "airport runs" and "Wal-Mart runs."

    c.   Upon information and belief, Defendant Jogan knowingly submitted invoices for payment to Plaintiff for placing providers in New Mexico facilities who were not properly credentialed in violation of the Contract.

67. Plaintiff's reliance on Defendant Jogan's multiple fraudulent invoices resulted in actual damages of $4,954,297.79.

68. As a result of Defendant Jogan's intentional and fraudulent actions, Plaintiff is entitled to an award for the full amount of damages allowable.

69. A constructive trust is appropriate to prevent the unjust enrichment resulting from a person being permitted to retain property obtained through wrongful conduct.

### COUNT V: CONSTRUCTIVE FRAUD

70. Plaintiff incorporates Paragraphs 1–70 as if the same were fully stated herein.

71. Defendant Jogan accepted the legal duty to submit accurate, properly supported invoices to Plaintiff for payment when it entered the Contract with Plaintiff.

72. Constructive fraud occurs when a party breaches its legal or equitable duty to another without requiring malicious motivation or intentional purposes to deceive on the part of the party committing the fraud.

73. As a party to the Contract, Jogan had the legal duty to bill only for services and costs allowable by the Contract and ensure the accuracy of all invoices submitted for payment to Plaintiff.

74. Defendant Jogan, knowing the Contract restricted the types of services and costs that could be invoiced, submitted invoices to Plaintiff for prohibited services and costs without proper review of the invoices for accuracy and conformity with the Contract.

75. Defendant Jogan breached its duty to Plaintiff by recklessly submitting bills and accepting payments for unsupported services and amounts not conforming with the Contract.

76. As a result of Jogan's fraudulent actions, Plaintiff was actually harmed and is entitled to an award for all damages allowable.

77. A constructive trust is appropriate to prevent the unjust enrichment resulting from a person being permitted to retain property obtained through wrongful conduct.

**COUNT VI: NEGLIGENT MISREPRESENTATION**

78. Plaintiff incorporates Paragraphs 1–78 as if the same were fully stated herein.

79.  Defendant Jogan had a duty to provide accurate billing information and details contained within the invoices submitted to Plaintiff for payment.

80. Defendant Jogan represented itself as a competent organization, well-versed in mobilizing appropriate medical providers to states in need of additional medical support.

81. Defendant Jogan represented itself as experienced in billing states for the provider placement services provided by Jogan.

82. Plaintiff reasonably relied on the accuracy of Jogan's invoices.

83. Defendant Jogan submitted invoices knowing that it had failed to verify the accuracy of the amounts being demanded from Plaintiff.

84. By submitting invoices to Plaintiff for payment, Defendant Jogan intended to induce Plaintiff's reliance on the accuracy of the invoices.

85. Plaintiff relied on Defendant Jogan's professional capabilities and oversight of its medical providers to submit accurate and truthful invoices to Plaintiff for payment.

86. By relying on Defendant Jogan's negligent misrepresentations, Plaintiff was actually harmed and is entitled to all allowable damages.

## COUNT VII: PRIMA FACIE TORT

87. Plaintiff incorporates Paragraphs 1–87 as if the same were fully stated herein.

88. The State of New Mexico recognizes a prima facie tort in instances where a defendant commits an intentional, lawful act with the intent to injure the plaintiff, that actually injures the plaintiff, and there is no justification for the defendant's actions.

89. Defendant Jogan's renewal of its demands for overtime hours over a year after it told Plaintiff it would not invoice it for overtime hours is not an illegal act, per se.

90. Defendant Jogan sought to obtain over $17 million more dollars from Plaintiff.

91. Paying over $17 million dollars for uncontracted expenses would significantly injure Plaintiff.

92. Plaintiff was forced to obtain legal counsel and a forensic accounting team to investigate the validity of Defendant Jogan's invoice that sought over $17 million more dollars for "overtime hours."

93. Plaintiff was forced to pay for the costs of its counsel, forensic accounting report, and filing this claim as a direct result of Defendant Jogan's actions.

94. Plaintiff was injured by Defendant Jogan's willful actions against it in the amount of money it was forced to expend as a result.

95. Plaintiff is entitled to an award of the full amount it has been injured in addition to punitive damages as a result of Defendant Jogan's actions.

## COUNT VIII: VIOLATION OF THE FRAUD AGAINST TAXPAYERS ACT, N.M. STAT. ANN., § 44-9-1 *ET SEQ.*

96. Plaintiff incorporates Paragraphs 1–96 as if the same were fully stated herein.

97. The Fraud Against Taxpayers Act ("FATA"), as codified at N.M. STAT. ANN., § 44-9-3, prohibits a person from knowingly "present[ing], or caus[ing] to be presented" "a false or fraudulent claim for payment or approval" to the State or the various entities and other recipients of "state or political subdivision funds," § 44-9-3(A), "conspiring to defraud the state or a political subdivision by obtaining approval or payment on a false or fraudulent claim," § 44-9-3(C), or, upon discovering that a false claim was inadvertently submitted, "fail[ing] to disclose the false claim to the state or political subdivision within a reasonable time after discovery." §44-9-3(D).

98. Defendant Jogan is a "person" for purposes of the FATA under N.M. STAT. ANN., § 44-9-2(D).

99. Defendant Jogan violated § 44-9-3(A) by knowingly requesting and accepting payment from Plaintiff in excess of the amount allowed by the Contract and/or for services not provided.

100. Defendant Jogan knew that Plaintiff used funds received from New Mexico taxpayers to pay for healthcare services provided to New Mexico residents.

101. The terms of the Contract gave Defendant Jogan actual knowledge that its excessive claims for payment from Plaintiff were false, fraudulent, or misleading when they were submitted.

102. Defendant Jogan acted in reckless disregard of the truth or falsity of its claims for payment when it submitted them to Plaintiff. Examples include, but are not limited to, the following:

    a. Defendant Jogan knew it could not bill for overtime pursuant to the Contract but nonetheless did so.

b.  Upon information and belief, Defendant Jogan knowingly submitted invoices for payment to Plaintiff for activities improperly categorized as "travel expenses" in violation of the Contract.

c.  Upon information and belief, Defendant Jogan knowingly submitted invoices to Plaintiff for Stand-Down Pay for providers while they were in the process of being credentialed in violation of the Contract.

103.  As a result of Defendant Jogan's fraudulent billing practices, Plaintiff has suffered actual damages in the amount of $4,954,297.79.

104.  As a result of Defendant Jogan's conduct, Plaintiff is entitled to an award of three times the amount of damage sustained, $14,862,893.91, in addition to the attorney's fees and costs associated with this action for recovery.

## COUNT IX: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT VIOLATIONS 18 U.S.C. §§ 1961–1968

105.  Plaintiff incorporates Paragraphs 1–105 as if the same were fully stated herein.

106.  Defendant Dan Dietrich is the founder and president of Defendant Jogan.

107.  At all times relevant to this complaint, Defendants Dan Dietrich and Jogan were and are each a "person" who jointly engaged in an "enterprise" as defined by 18 U.S.C. 1961.

108.  At all times relevant to this complaint, Defendants engaged in a pattern of fraudulent racketeering activities as enumerated in 18 U.S.C. 1961(1).

109.  The pattern of racketeering activities engaged and affected interstate commerce.

110.  Defendants' activities involved the use of the U.S. Postal Service, electronic communications to commit fraud, and schemes to defraud New Mexico's healthcare system.

111.    Defendants jointly utilized multiple, fraudulent misrepresentations to induce Plaintiff to enter the Contract with Jogan and subsequently issue numerous fraudulent billing statements to New Mexico from Jogan's headquarters in Colorado.

112.    Defendants Dan Dietrich and Jogan knew that the global health crisis caused by COVID-19 would create turmoil and invoice tracking issues in healthcare centers attempting to staff their facilities for the rapidly increasing demand for medical treatment.

113.    Defendants Dan Dietrich and Jogan capitalized on the chaos of the COVID-19 pandemic by fraudulently transmitting bills across state lines for millions of dollars of services not provided to the people of New Mexico.

114.    Defendant Dan Dietrich's actions through Defendant Jogan demonstrate a pattern of racketeering activity with the goal, and ultimate result, of illegally profiting from Plaintiff through fraudulent, billing practices.

115.    Defendants Dan Dietrich and Jogan's racketeering activities and fraudulent billing caused Plaintiff to suffer actual damage to its business or property in the amount of $4,954,297.79.

116.    As a result of Defendants Dan Dietrich and Jogan's racketeering activity, and the economic injury suffered from that activity, Plaintiff is entitled to an award of three times its actual damages, a sum of $14,862,893.91, in addition to the attorney's fees and costs associated with Plaintiff's actions for recovery.

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff, the State of New Mexico, requests entry of judgment against Defendants Jogan Health, LLC and Dan Dietrich and pray for the following relief:

A.  The imposition of a constructive trust for the property unjustly retained by Defendants.

B.  Actual damages due to Plaintiff in the amount determined at trial.

C.  Reasonable attorney's fees and costs incurred by Plaintiff in bringing this action.

D.  Three times the amount of damages sustained by Plaintiff through the FATA violation, *see* N.M. STAT. ANN., § 44-9-3(C)(1), and Civil RICO. *See* 18 U.S.C.S. § 1964(c).

E.  Payment of a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) for each FATA violation. *See* § 44-9-3(C)(2).

F.  Treble damages under Civil RICO, attorney fees and costs under 18 U.S.C. § 1964(c).

G.  Punitive damages in an amount to be established at trial to deter similar conduct by Defendants and others in the future.

H.  Any and all other relief, including equitable relief, that the Court finds is proper and just.

DATED: October 22, 2025

Respectfully submitted,

**ROBLES, RAEL & ANAYA, P.C.**

By:     */s/ Marcus J. Rael, Jr.*
        Marcus J. Rael, Jr.
        Phoebe J.W. Roderick
        500 Marquette Ave. NW, Suite 700
        Albuquerque, NM 87102
        (505) 242-2228
        marcus@roblesrael.com
        phoebe@roblesrael.com

        -and-

**RAÚL TORREZ**
**ATTORNEY GENERAL**

Edward L. Marshall
Director of Government Litigation
408 Galisteo Street

20

Santa Fe, New Mexico 87501
(505) 490-4060
emarshall@nmdoj.gov

-and-

**OFFICE OF GENERAL COUNSEL,
New Mexico Department of Health**

Julie Sakura, General Counsel
Christopher Woodward, Asst. General
Counsel
1190 St. Francis Drive, Suite N4095
Santa Fe, New Mexico 87502
julie.sakura@doh.nm.gov
chris.woodward@doh.nm.gov

*Counsel for Plaintiff*

## VERIFICATION

STATE OF NEW MEXICO                    )
                                       ) ss.
COUNTY OF BERNALILLO                   )

I, _LeAnn Behrens_, state that I have read the foregoing Verified Complaint for Injunctive Relief and Civil Penalties and Monetary Damages and the assertions therein are true and correct, according to my information and belief.

On this _22_ day of _October_, 2025, I affirm under penalty of perjury under the laws of the State of New Mexico that the statements in this Verification are true and correct.

_____

LeAnn Behrens, Deputy Secretary
New Mexico Department of Health

The foregoing instrument was sworn, subscribed, and acknowledged before me by Deputy Secretary LeAnn Behrens of the New Mexico Environment Department on this _22_ day of _October_, 2025.

_____
Notary Public

State of New Mexico
Notarial Officer
Amanda H. Frazier
State Bar #14653

My Commission Expires:
NA Bar #14653