**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**STATE OF NEW MEXICO,** *ex rel.* **RAÚL
TORREZ, ATTORNEY GENERAL,**

      Plaintiff,

**v.**                                 **Case No.  1:25-CV-01058-LF-JFR**

**JOGAN HEALTH, LLC, and DAN
DIETRICH, individually and as Sole Owner
and CEO of Jogan Health, LLC,**

      Defendants.

### PLAINTIFF'S RESPONSE TO DEFENDANT JOGAN HEALTH'S MOTION TO DISMISS ALL BUT COUNT I

**COMES NOW,** Plaintiff, the State of New Mexico, by and through its Attorney General

Raúl Torrez and Edward Marshall, ("New Mexico" or the "State"), and by and through its counsel

of record, NMDOH Office of General Counsel and Robles, Rael & Anaya, P.C. (Marcus J. Rael,

Jr. and Phoebe J.W. Roderick), with its Response to the Defendant Jogan Health's Motion to

Dismiss all But Count I ("Jogan Health MTD"), joined by Defendant Dan Dietrich without waiving

his personal jurisdiction arguments, and states as follows:

### INTRODUCTION

Defendants seek to force the language of the Complaint into a simple breach of contract

claim, therefore barring all other claims, but this misrepresents the nature of the claims raised

against them.  Defendants knowingly sending statutorily fraudulent invoices to the State of New

Mexico during an Emergency Health Crisis and, after agreeing to change its invoicing practices to

induce the State's signature on the Contract's Amendment 02, continuing to submit invoices, with

reckless disregard to their accuracy, to the State, in violation of its contractual obligations and

State and Federal law.  Defendants not only sent fraudulent claims for payment and misrepresented their ability to properly oversee a government contract, but, after the Contract was fully terminated, Defendants sent a $17,000,000 bill for charges already written off from their invoices.

Defendants cannot avoid responsibility for the fraud visited upon the State of New Mexico simply because there had been a contract.  The State did not expect Defendants to continue submitting fraudulent invoices because, after becoming concerned over Defendants' invoices, the Contract had been renegotiated to clarify disallowable charges. To allow Defendants to avoid responsibility for their actions by dismissing the Complaint before discovery can be conducted would be a disservice to the taxpayers of New Mexico and deprives the State of its right to a jury trial under the Seventh Amendment.

**LEGAL STANDARD**

Rule 12(b)(6) of Fed. R. Civ. P. allows the Court to dismiss complaints for "failure to state a claim upon which relief may be granted."  To withstand a Motion to Dismiss under Rule 12(b)(6), a complaint need not provide a litany of "detailed factual allegations" but must simply show the plausibility of the claim on its face.  In other words, the claim must "raise a right to relief above the speculative level." *Hall v. Witteman*, 584 F.3d 859, 863 (10th Cir. 2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When reviewing the sufficiency of a complaint prior to receiving evidence from either party, the federal court's task is "necessarily a limited one." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by*, *Davis v. Scherer*, 468 U.S. 183 (1984).  The Court must

2

accept all well-pleaded allegations as true and construe those facts in the light most favorable to the plaintiff, *see Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007), while determining whether the facts raised provide sufficient support to allow a claimant "to offer evidence to support the claims" that have been alleged. *Id.*

Fed R. Civ. P. Rule 9(b) requires that claims of fraud or mistake be made with particularity. However, the requirements of Rule 9(b) are to be "read in conjunction with the principles of Rule 8," *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997), thus balancing the need for a short and plain statement of the complaint with the purpose of Rule 9(b), which is to "afford [a] defendant fair notice of the plaintiff's claim and the factual ground upon which it is based." *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 987 (10th Cir. 1992) (citations and quotations omitted).

It is not necessary for the allegations of each separate count to contain detail "which would give sufficient notice to Defendants of the basis for the claim," because "it is expected that Defendants will be reading the rest of the [Complaint] as well." *Bull v. BGK Holdings, LLC*, 859 F.Supp.2d 1238, 1247 (D.N.M. 2012). Provided that the allegations in the complaint identify the time and place of the alleged misrepresentations, in addition to the identity of the individual(s) making the misrepresentations, there is sufficient support for a viable claim and for Defendants to "effectively proceed with discovery in order to formulate a defense to th[e] claim." *Id.* at 1247–48. Furthermore, when the facts in question "are peculiarly within the opposing party's knowledge," *Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir. 1992), pleadings beginning with a "lengthy and detailed factual recitation thoroughly setting out the circumstances giving rise to [the plaintiff's] fraud claims," combined with "brief information-and-belief allegations regarding the

3

intent or purpose of some of [the defendant's] actions," satisfy Rule 9(b). *Id.*; *see also SE Technologies, Inc. v. Summit Electric Supply Co.*, 2002 WL 3650147 (not reported) (requiring claims to be "judged in their entirety" when determining the sufficiency of claims under Rule 9(b)).

For purposes of this Response, all Exhibits are referencing the Exhibits attached to the Complaint.

<strong>DISCUSSION</strong>

The Economic Loss Rule restricts the use of tort claims to recover for economic injuries arising from a party's breach of contract. *Bull*, 859 F.Supp.2d at 1243; *see also*, *In re Consolidated Vista Hills Retaining Wall Litigations*, 1995-NMSC-020, ¶ 28, 119 N.M. 542 [hereinafter *Vista Hills*] ("As a matter of policy, the parties should not be allowed to use tort law to alter or avoid the bargain struct in the contract."). The purpose behind this policy is to allow contracting parties to allocate the risk of the bargain as they see fit. *See Utah Int'l, Inc. v. Caterpillar Tractor Co.*, 1989-NMCA-010, ¶ 17, 108 N.M. 539.

The Economic Loss Rule does not, however, allow Defendants to avoid accountability for their predatory actions simply because a contract existed. First, the Economic Loss Rule applies only where parity in bargaining power existed between the contracting parties. *See Id.* ¶ 7. Second, none of the claims raised by the State are barred under the Rule, as each claim arises from duties independent of the duties negotiated for in the Contract. *See Bull*, 859 F.Supp.2d at 1243.

      1. *The Economic Loss Rule cannot be applied when there is no parity in bargaining power between the contracting Parties.*

Some service contracts, or "commercial transactions where the parties share equal bargaining power" are barred by the Economic Loss Rule. *See Farmers Alliance Mut. Ins. Co. v.*

4

*Naylor*, 480 F.Supp.2d 1287, 1292 (D.N.M. 2007) [hereinafter *Naylor II*].  However, since the adoption of the Economic Loss Rule, New Mexico courts have applied it only to strict products liability cases. *NM-Emerald, LLC v. Interstate Development*, 2021-NMCA-020, ¶ 9; *see, e.g.*, *Utah Int'l, Inc.*, 1989-NMCA-010, ¶ 3 (finding the Economic Loss Rule prohibited strict products liability claims); *Spectron Dev. Lab. V. Am. Hollow Boring Co.*, 1997-NMCA-025, ¶ 20, 123 N.M. 170 (finding the Economic Rule prohibited recovery in strict products liability); *see also Vista Hills*, 1995-NMSC-020, ¶¶ 25, 31 (declining to expand the Economic Loss Rule to bar claims for indemnification).

Expanding the Economic Loss Rule to professional service contracts goes against both logic and precedent when considering that it applies only where "no large disparity in bargaining power" exists between contracting parties. *See Utah Int'l, Inc.*, 1989-NMCA-010, ¶ 3.  Parity in bargaining power exists when both parties can anticipate the risks that could affect the delivery of the contracted-for benefit. *Naylor II*, 480 F.Supp.2d, at 1292 ("In the construction setting . . . the parties to the contract frequently enjoy equal ability to anticipate the potential problems that may arise during the course of a commercial relationship and build into the commercial contract provisions reflecting such risks.").

Professional services contracts have not been subject to the Economic Loss Rule because the recipient of professional service contracts is contracting for a professional with knowledge not possessed by nonprofessional parties who "frequently lack[] the ability to anticipate the risks inherent in the provision of those services" thus "prevent[ing] the parties from allocating those risks in the terms of the contract." *Id.*, *see AIG Aviation Ins. v. Avco Corp.*, 709 F.Supp.2d 1124, 1127–28 ("The economic loss rule's basic premise is that parties who have both the capacity and

inclination to allocate risk and liability through a contract should not, *ex post*, be subjected to the unsteady waters of tort liability."); *Bhandari v. VHA Southwest Community Health Corp.*, No. CIV 09-0932 JB/GBW, 2011 WL 1336515, *23–24 (D.N.M. Mar. 30, 2011) (explaining that the Economic Loss Rule does not bar professional services contracts because 1) the need to "protect[] the parties' freedom to allocate economic risk by contract is not implicated" in professional services contracts, and 2) allocating the risk to the party in the best position to assess the risk is inappropriate because "the information disparities between the parties do not support such a presupposition.").

> 2. *New Mexico did not have equal bargaining power with Defendants during contracting.*

There could be no parity in bargaining power between the State and Defendants while negotiating due to the COVID-19 Pandemic. COVID-19 quickly wreaked havoc throughout New Mexico, resulting in over 261,370 cases by the time the contract was entered in October 2021. Complaint, at ¶ 13; *see also New Mexico COVID-19 update: 2,433 new cases, totaling 261,370*, N.M. DEPT. HEALTH (Oct. 12, 2021), https://www.nmhealth.org/news/awareness/2021/10/?view =1681. Hospitalizations and deaths strained an already understaffed and overburdened healthcare system and national competition for qualified providers further limited the providers available to New Mexico. Complaint, at 2–3.

New Mexico, a state with limited medical resources, could not have had superior, or even equal, bargaining power to Defendants during the Pandemic. *Id.* Skyrocketing national demand empowered Defendants to control contract terms and rates. As severe illness spread rapidly, New Mexico, not Defendants, was in a weakened negotiating position, underscoring the disparity of power. Additionally, State employees, as government workers rather than medical professionals, did not have the specialized knowledge to foresee the risks embedded in a hospital-staffing

contract during the Pandemic.  Defendant, by contrast, held itself out as a hospital-placement specialist and is presumed to understand those inherent risks. Complaint ¶ 80.  With such great disparities in bargaining power, the economic loss rule is sorely misplaced as a defense to the State's claims against Defendants.

   3. *The State's claims against Defendants arise from duties independent from the Contract.*

Even if parity of bargaining power existed between the Parties, the Economic Loss Rule is still inapplicable in this case.  Defendants have claimed that all claims except those for breach of contract are barred, however, "[t]his assumption is erroneous. The economic loss rule precludes recovery in tort only when the duty breached is a contractual duty." *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1226 (10th Cir. 2000).  Fraud, constructive fraud, and negligent misrepresentation all arise from an independent common law duty. *See infra*.  The actions prohibited by New Mexico's Fraud Against Taxpayer's Act ("FATA"), the False Claims Act ("FCA") and Civil RICO involve statutorily and regulatorily designated duties, independent of any contractual obligation.

When a complaint's allegations go beyond the failure to perform under a contract, tort claims such as fraud—constructive or not—and negligent misrepresentation, are not barred by the Economic Loss Rule. *Bull*, 859 F.Supp.2d at 1243–45 (declining to apply the Economic Loss Rule to the plaintiff's negligent misrepresentation claims as they arise from an independent duty); *see Bhandari*, 2011 WL 1336515, *25 (declining to apply the Economic Loss Rule because the allegations of fraud went beyond allegations that a party failed to perform under the contract); *SE Technologies, Inc. v. Summit Electric Supply Co.*, No. 00-1511 LH/LFG ACE, 2002 WL 35650147 (D.N.M. 2002) ("Fraud and misrepresentation are not foreseeable, nor are their attendant damages,

7

at the time that parties enter into a contract. . . . It would be unfair for [the tortfeasor] to utilize the law of contract to shield itself from liability in tort for its deliberate or negligent misrepresentations."); *see also United Int'l Holdings, Inc.*, 210 F.3d at 1227 ("A negligent misrepresentation claim is based not on a contractual duty but on an independent common law duty.").

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

Fundamental to New Mexico's contract law is the implied covenant of good faith and fair dealing. *See Cont'l Potash Inc. v. Freeport-McMoran, Inc.*, 1993-NMSC-039, ¶ 64, 115 N.M. 690, ("Whether express or not, every contract in New Mexico imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract."); *Paiz v. State Farm Fire & Cas. Co.*, 1994-NMSC-079, ¶ 31, 118 N.M. 203 ("[T]he implied covenant of good faith and fair dealing protects only against bad faith—wrongful and intentional affronts to the other party's rights, or at least affronts where the breaching party is consciously aware of, and proceeds with deliberate disregard for, the potential of harm to the other party.") (footnote omitted).  This covenant requires that neither party to the agreement "do anything that will injure the rights of the other to receive the benefit of their agreement." *Bourgeous v. Horizon Healthcare Corp.*, 1994-NMSC-038, ¶ 16, 117 N.M. 434.

The State and Defendants entered a contract with set parameters for what could and could not be invoiced. Complaint, at ¶¶ 13–35, 45.  By executing the Contract, Defendants accepted the duty of good faith and fair dealing, *id.*, at ¶ 47, and were required to take reasonable care to submit accurate invoices, clarify any ambiguities that may result in inaccuracies, and sufficiently protect the interests of the other Party to the Contract. *Id.*, at ¶¶ 46–48.  Reasonable care in invoicing State

entities requires, at minimum, a cursory review of invoices and the sufficiency of supporting documentation prior to submitting invoices for payment.

Defendants violated their duty to protect the interests of the State by submitting millions of dollars' worth of invoices without verifying their accuracy, submitting inadequate documentation in support of the fraudulent invoices, and committing multiple violations of the contracted-for terms that would have been easily identified through basic review by Defendants prior to submission. Complaint, ¶¶ 44–52. This willful and intentional practice by Defendants goes beyond the level of simple negligence or mistake and resulted in a multi-million-dollar fraudulent gain for Defendants at the expense of the State. *Id.* By failing to take care in billing the State, and by keeping the improperly paid amounts, Defendants have violated their duty of good faith and fair dealing.

## UNJUST ENRICHMENT

Under New Mexico law, unjust enrichment is an equitable doctrine that applies when one party has knowingly benefitted at another's expense, such that retention of the benefit is unjust. *City of Rio Rancho v. Amrep Sw. Inc.*, 2011-NMSC-037, ¶ 52, 150 N.M. 428, 260 P.3d 414 [hereinafter *Amrep*]; *Starko, Inc. v. Presbyterian Health Plan, Inc.*, 2012-NMCA-053, ¶ 90, *rev'd on other grounds*, 2014-NMSC-033. To prevail, a plaintiff must establish both that the defendant knowingly received a benefit and that allowing the defendant to retain that benefit would be inequitable under the circumstances. *Amrep*, 2011-NMSC-037, ¶ 52. Because unjust enrichment is grounded in equity, courts retain broad discretion to fashion remedies necessary to prevent unjust retention of benefits, including the imposition of a constructive trust where appropriate. *Id.* ¶¶ 52–53.

Defendants have received several millions of dollars through the State's payment of invoices that Defendants fraudulently, or otherwise improperly, submitted to the State. *See* Complaint, ¶¶ 53–60. Ultimately, it was New Mexico taxpayers who funded Defendants' ill-gotten gains resulting from their improper invoicing, which included an invoice for a medical provider unable to provide care in the state, Complaint, at ¶¶ 20, 66(c). It is unjust for Defendants to profit from their own misconduct, and the Court should place the State funds received by Defendants in a constructive trust until the amount of funds improperly paid to Defendants is determined and returned to the people of New Mexico. Complaint, at ¶¶ 58–61.

### FRAUD

Common law fraud exists when a defendant 1) makes a misrepresentation of fact, that 2) the defendant knows to be false, with 3) the intent to deceive and induce the other party to act in reliance on the misrepresentation, and 4) the other party did actually rely on the misrepresentation to their detriment. *Battishill v. Ingram*, 2024-NMCA-001, ¶ 20. Defendants seek to dismiss Count IV of the State's Complaint by claiming that the allegations under Count IV describe nothing more than a contract dispute. *See* Jogan Health MTD, at 6–9. This position ignores the content of the Complaint and seeks to confine the State's allegations to isolated sections rather than reading the Complaint as a whole.

The Complaint sets out the factual allegations of Defendants' fraudulent actions throughout the document. The Parties entered a contract on October 22, 2021. Complaint, ¶ 13. Within months after entering the Contract, the State became concerned about invoices that did not appear accurate or properly supported. *Id.*, at 3. Terminating the Contract during a global pandemic would leave New Mexicans without sufficient medical providers. Complaint, at 3. The State identified

at least one (1) paid invoice for a healthcare provider that was not credentialed to legally work in New Mexico, and therefore could not, and did not, provide services to the State. *Id.*, ¶¶ 20–21, 66(c). In determining whether to terminate the Contract for convenience or risk continuing to receive erroneous invoices by continuing to work with Jogan Health, *id.*, at 3, ¶ 23, the State brought its concerns over the discovered invoice to Jogan Health. *Id.* As a result of these discussions, and Jogan Health's promises that it would invoice as contracted, the State agreed to sign Amendment 2, Complaint, ¶ 22; **Exhibit 1B**, increasing the number of providers deployed to New Mexico, clarifying allowable items for invoicing, and increasing the available compensation to Jogan Health to $58,459,000, including New Mexico Gross Receipts Tax. **Exhibit 1B**, at 1–2.

By arguing that the Complaint fails to plead fraud because the State "believed the invoices were incorrect when it received them," Jogan Health MTD, at 9, Defendants ignore that the identified and paid fraudulent invoice: 1) prompted the State to seek renegotiation, Complaint at 3, and 2) illustrated Defendants' broader fraudulent billing practices. Complaint ¶ 66(c). However, the isolated fraudulent invoice is not the conduct being addressed in Count IV. The negotiation of Amendment 2, Complaint ¶ 23, necessarily involved the State's reliance on Jogan Health's promises made during those negotiations and it is Defendants' continued fraudulent billing *after* the inducement of the State's signature on Amendment 2 that constitutes the fraud visited upon the State by Defendants.

## CONSTRUCTIVE FRAUD

Constructive fraud arises from the breach of a legal or equitable duty that the law declares fraudulent because of its tendency to deceive others, even in the absence of actual dishonesty of purpose or intent to deceive. *Battishill*, 2024-NMCA-001, ¶ 19 (quoting *Gabriele v. Gabriele*,

11

2018-NMCA-042, ¶ 13 n.4; *Parker v. E.I. DuPont de Nemours & Co.*, 1995-NMCA-086, ¶ 37, 121 N.M. 120. A constructive fraud claim exists when a party fails to disclose material facts despite a duty to speak arising from the circumstances or from a relationship of trust and confidence between the parties. *Barber's Super Mkts., Inc. v. Stryker*, 1972-NMCA-089, ¶ 42, 84 N.M. 181.

The duty to disclose arises where one party possesses superior knowledge, expertise, or a position of confidence such that silence would mislead the other party, and the breach of that duty may constitute fraudulent concealment even absent intentional misrepresentation. *JL v. N.M. Dep't of Health*, 165 F. Supp. 3d 1048, 1082–83 (D.N.M. 2016). Accordingly, constructive fraud focuses on the existence and breach of a duty to disclose material information rather than proof of scienter.

Even if Defendants lacked the scienter necessary for actual fraud, Defendants had an obligation to disclose material information unknown to the State due to the disparity in professional knowledge between the Parties. Beyond any fraudulent representations made during negotiations of Amendment 2, Defendants submitted invoices that were neither reviewed nor supported. Complaint ¶¶ 70–76. As specialists in supplying temporary hospital contractors, ¶¶ 79–81, Defendants were obligated to disclose essential data unknown to the State in order to receive payment. *See* **Exhibit 1**, at 6–7 (detailing the requirements for invoices and their contents). By withholding crucial information, Defendants misled the State about the invoices' accuracy and legitimacy, resulting in fraud irrespective of Defendants' intent.

## NEGLIGENT MISREPRESENTATION

Negligent misrepresentation is a separate action from fraud or deceit, *Maxey v. Quintana*, 1972-NMCA-069, ¶ 17, 84 N.M. 38, because negligent misrepresentation requires neither

dishonesty nor an intent to deceive. *Id.*  In a negligent misrepresentation claim, a party must have relied on another party's material misrepresentation, that the speaker had 1) no reasonable grounds to believe was true, and 2) had made the misrepresentation with the intent to have the other party rely upon it.  Rule 13-1632, N.M. R. ANN.  Beyond this, the conveyor of the misrepresentation must have had an independent duty to disclose the information, and the party relying on the misrepresentation must have had a right to do so. *Battishill*, 2024-NMCA-001, ¶ 19.

In Defendants' discussion of the State's claim for negligent misrepresentation, Defendants again claim that the State "did not believe that Jogan was entitled to receive the invoices," Jogan Health MTD, at 10, which, again, mischaracterizes the State's Complaint.  As stated above, and in the Complaint, the State identified invoices that it did not think were accurate, prompting the renegotiation of the Contract with Defendants in February 2022. *See supra*; Complaint, at 3, ¶¶ 22–23; **Exhibit 1B**.  After discussing its concerns with Defendants, and signing Amendment 2, Complaint, at ¶ 22, the State would have had no reason to believe that Defendants' invoices would be inaccurate.  Defendants' assertions that the State has somehow admitted that it willingly accepted and paid invoices that it thought were false is either a misreading of the Complaint or a deliberate twisting of the State's allegations.

The State's claim is adequately pleaded in the Complaint, and Defendants have failed to present reasonable grounds for dismissal other than blaming the State for relying on Defendants' promises.  Defendants had a duty to provide accurate, verified, invoices to the State based on the Contract. *See* **Exhibit 1**, **Exhibit 1A** (Amendment 1 to the Contract, adding requirements to adhere to Federal FEMA and FCA restrictions), and **Exhibit 1B**.  The State, a party to the Contract, had a legal right to rely on these invoices submitted by Defendants. *Id.*  Defendants did not provide

reasonable oversight or documentation to ensure the accuracy of the invoices that were submitted to the State and, as a result, the State and its taxpayers were harmed by relying on Defendants' negligently submitted invoices. Complaint, ¶¶ 78–86.

## PRIMA FACIE TORT

New Mexico is one of the few states that has allowed an independent claim for prima facie tort. *Beaudry v. Farmer's Ins. Exch.*, 2018-NMSC-012, ¶ 10.  Prima facie tort is used to hold an individual accountable for the intentional harm caused by that individual's lawful act. *Schmitz v. Smentowski*, 1990-NMSC-002, ¶ 37, 109 N.M. 386 ("The theory underlying prima facie tort is that a party that intends to cause injury to another should be liable for that injury, if the conduct is generally culpable and not justifiable under the circumstances.").  This does not mean that prima facie tort is available for any, and all, injuries suffered at the hands of someone legally protecting their interest, but in situations where the defendant: 1) commits a lawful act, 2) with the intent to injure the plaintiff, 3) that actually results in injury to the plaintiff, and 4) has no, or insufficient, justification for those acts other than to harm the plaintiff, prima facie tort is available. *Id.*

New Mexico has narrowed prima facie tort in various ways to keep its scope confined to its proper purpose. *Lexington Ins. Co. v. Rummel*, 1997-NMSC-043, ¶ 11, 123 N.M. 774 ("Prima facie tort was not intended to provide a remedy for every intentionally caused harm. Rather, the cause of action provides a remedy for acts committed with an intent to injure the plaintiff and without justification.") (internal citations omitted).  One limitation is that the claim must not be used to "evade other established doctrines of law generally." *Beaudry*, 2018-NMSC-010, ¶ 14. This prevents a plaintiff from using prima facie tort claims to circumvent legitimate defenses to claims including defamation, intentional infliction of emotional distress, *id.* ¶ 15, or established

14

contract law, such as the right utilize a termination clause to terminate an agreement. *Id.* ¶ 21 ("Whether a party has the right to terminate a contract is squarely a question of contract law."). Another limitation is that, while the claim is allowed to be pleaded in the alternative, "if at the close of the evidence, plaintiff's proof is susceptible to submission under one of the accepted categories of tort, the action should be submitted to the jury on that cause and not under prima facie tort." *Schmitz*, 1990-NMSC-002, ¶ 48.

Prima facie tort was accepted by New Mexico courts for situations like the one before the Court today: to provide a mechanism to protect against intentional injuries caused by technically legal actions where no other avenue for relief exists for the injured party.  It was not technically illegal for Defendants to send a $17 million-dollar demand letter to the State over a year after the termination of the Contract. Complaint, at 4.  It was, however, unjustified in the face of Defendants' agreement to adhere to FEMA restrictions, *see* **Exhibit 1A**, §I(c), and Defendants' promise not to invoice the State for overtime, Complaint, at 4, and any payment made in response to that demand letter was guaranteed to injure the State and its taxpayers. Complaint, ¶¶ 89, 91. Defendants intentionally chose to send this demand letter to maximize their ill-gotten gains from exploiting a worldwide health crisis rather than adhering to their contractual obligation to not bill the State for the items disallowed by the Contract. *See* **Exhibit 1A**, § I(c).  As a matter of policy, Defendants should not be allowed to avoid the repercussions for their attempts to extort a state in crisis simply because sending a bill to a former client is, generally, legal. *See infra* for discussion of the illegality of Defendants' actions.

**FRAUD AGAINST TAXPAYERS ACT**

Jogan Health's assertion that the State has not sufficiently linked its claims to Defendants' fraudulent conduct for purposes of fraud, or the New Mexico Fraud Against Taxpayers Act ("FATA"), Jogan Health MTD, at 8–9, 13–17, misstates the applicable liability framework.  Under both State and Federal law, liability arises where a party *knowingly* submits false claims, *see* N.M. Stat. Ann. §§ 44-9-3(A)–(B), or knowingly keeps funds improperly received for false claims, § 44-9-3(A)(8), where knowingly includes reckless disregard or deliberate ignorance of the truth. *See* N.M. Stat. Ann. §§ 44-9-2(C)(2)–(3).  Defendant's conduct falls squarely within these standards, and Defendant's conclusory assertions to the contrary do not defeat the State's claims.

FATA imposes civil liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval by the State. N.M. Stat. Ann., § 44-9-3(A)(1).  By including conduct such as "deliberate ignorance" and "reckless disregard" of the "truth or falsity of the information," § 44-9-2(C)(2), (3), New Mexico places an elevated standard on the invoices that may be submitted to the State for payment.  This standard, while not meant to punish simple mistakes, creates a *statutory requirement* that contractors of the State verify the accuracy of invoices submitted to the State for payment.

Defendants claim that "the State does not make any factual allegations that Jogan made any certifications about 'compliance with any statutory, regulatory, or contractual requirements' that were 'material to the Government's payment decision." Jogan Health MTD, at 15 (citing *U.S. ex rel. Conner v. Salina Regional Health Center, Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008).  However, the Complaint's repeated reference to Defendants' fraudulent billing under the terms of the contract, *see e.g.*, Complaint, ¶¶ 83, 99, 102, encompasses the agreements made in

16

Amendment 1 to adhere to the requirements of FEMA and the federal False Claims Act ("FCA"). *See* **Exhibit 1A**, at I(c), (e).  Not only did Defendants agree to take reasonable care to verify the accuracy of any invoices sent to the State by signing a contract with documentation and invoice sufficiency requirements, **Exhibit 1**, at 6–7; **Exhibit 1A**, § I(c), but Defendants, as subrecipients of FEMA funds, agreed to adhere to FEMA's requirements, including certifying the accuracy of their payment requests. *See* 2 CFR § 200.415(b).

That the Parties "disagree about the extent of the State's contractual obligations," Jogan Health MTD, at 14, is not the conduct that makes Defendants' actions illegal in the face of FATA. Defendants recklessly, or deliberately, submitted millions of dollars' worth of invoices to a *state*, in order to obtain federal funding through that state, without verifying the accuracy of the invoices, or supporting documentation, to ensure that they were entitled to the money that they were demanding—a direct violation of FATA, N.M. Stat. Ann. § 44-9-2(C)(1), and FEMA. *See* 2 CFR § 200.400(c)–(d) (requiring subrecipients to employ appropriate techniques to ensure proper accounting and use of funds), and 2 CFR § 200.400(g) (requiring the return of all federal funds when not completed in accordance with the terms and conditions of the award).

The Tenth Circuit recognizes both express and implied false certifications.  *Connor*, 543 F.3d at 1217.  An express false certification occurs when a government payee falsely certifies compliance with statutory, regulatory, or contractual prerequisites for payment. *Id.* The form of the promise made by the government payee can be through the submission of an invoice or "any other express means." *Id.*  Implied false certifications are determined by analysis of the particular statute, regulation, or contract underlying the promise. *Id.* at 1218. In *Connor*, the plaintiffs' claims were premised on a certification of compliance with "general sweeping language [that] does not

17

contain language stating that payment is conditioned on perfect compliance with any particular law or regulation." *Id.* at 1219.  Here, Amendment 1 explicitly required conformance with FCA and FEMA requirements as a condition for payment. *See* **Exhibit 1A**.  By signing Amendment 1, and subsequently submitting invoices to Plaintiffs, Defendants expressly or impliedly, depending on the sufficiency of Defendants' invoices, certified compliance with the accuracy and verification requirements within those Acts by their invoices. Complaint, at ¶¶ 99–102.

Defendants' claim that the State has only listed contract term disputes rather than whether services were actually provided is misleading at best. Jogan Health MTD, at 15.  Plaintiffs included various contract violations throughout the Complaint to illustrate Defendants' failure to adhere to the federal guidelines it agreed to comply with.  Defendants failed their commitment to comply with FEMA policy by failing to adhere to the contract terms. *See* 2 CFR § 200.318(b) (requiring subrecipients to maintain proper oversight to ensure their contractors, here Jogan Health's medical providers, adhere to the "terms, conditions, and specifications of their contracts or purchase orders.").  Defendants' assertions that the State has failed to plead the existence of services that were billed for but not provided are equally inaccurate.  The State pleaded that it believed that services invoiced by Defendants had not been provided, Complaint ¶ 21 (billing for a provider who could not legally provide services is equivalent to billing for services not provided), ¶ 99 (explicitly mentioning services not provided), and, until discovery is able to be conducted, the State is without sufficient information to plead more than its belief that additional invoices for services not provided were submitted and paid.

The deficiencies asserted by Defendants for purposes of FATA are not deficiencies that a Complaint must overcome for a Motion to Dismiss.  As explained, the State pleaded that

Defendants signed a contract requiring it to adhere to State and Federal laws and regulations regarding accuracy of invoices submitted to a government for payment. *See* Complaint ¶¶ 13–14; **Exhibit 1A**. The State has sufficiently pleaded that, during the term of the Contract, Defendants consistently submitted fraudulent claims under FATA. Complaint, at 4 (discussing the forensic accounting results); ¶¶ 13–35, 96–104. To dismiss this claim before discovery can be commenced would be a public wrong to the taxpayers of New Mexico, and the United States, and would embolden other government contractors to take advantage of State and Federal resources available for emergency assistance during national disasters, such as the effects of a global pandemic.

## RICO ACT VIOLATIONS

What is the appropriate response for a State that discovers it has been defrauded for over $4 million of its taxpayers' funds after initiating a forensic audit of invoices received? Complaint, at 4. Particularly when the $4 million was taken by the same entity that brazenly sent the State a $17 million demand letter for disallowed charges that had been voluntarily removed from that entity's previously paid invoices. *Id*., at 3–4. Is it a "thermonuclear" reaction to seek to use the tool specifically developed by Congress to deter the exact actions Defendants have taken against the State of New Mexico and its taxpayers? *See* Jogan Health MTD, at 17. The Complaint, read as a whole, details sufficient facts regarding the coordinated conduct of Jogan Health and Dan Dietrich for the State's Civil RICO claim to survive a Motion to Dismiss under Rule 12(b)(6).

1. *Civil RICO was created to deter the exact conduct exhibited by Defendants.*

Civil RICO was created as an expansive remedy for those who have suffered economic harm caused by coordinated racketeering activity. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 151 (1987). Initially, criminal organizations were the target of

19

adopting the RICO Act, but it was the illegal actions taken through the legitimate business activities of those enterprises that were intended to be implicated in Civil RICO claims. *Id.* (discussing Senator Hruska's explanation that civil RICO should be "*used more extensively* against the 'legitimate' business activities of organized crime") (citing 113 Cong. Rec. 17999 (1967)) (emphasis added). In this light, Civil RICO was drafted to deter an extensive list of racketeering activities spreading from wire fraud to human trafficking perpetrated by legitimate business organizations. 18 U.S.C. § 1961.

To deter these predicate acts, Civil RICO provides an avenue of recovery to a victim, or a "person," 18 U.S.C. § 1964(c), that is economically injured due to an entity's pattern of one or more predicate offenses. *Sedima v. Imrex Co.*, 473 U.S. 479, 495 (1985) ("If the defendant engages in a pattern of racketeering activity in a manner forbidden by § 1962, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c)."). In addition to proving that the defendant participated in a pattern of racketeering activity that economically injured them, 18 U.S.C. § 1964(c), a claimant must prove that the racketeering activity factually and proximately caused the harm to the claimant's business or property. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992).

The New Mexico Department of Health ("NMDOH") is a "person" for purposes of Civil RICO. *See* 18 U.S.C. § 1961(3) ("[P]erson includes any individual or entity capable of holding a legal or beneficial interest in property."); Complaint, at ¶ 1 (citing N.M. STAT. ANN., § 24-1-3, which gives NMDOH the capability of holding a legal or beneficial interest in property by granting it the authority to receive grants, subsidies, donations, and other monetary amounts through Subsection A).

20

>    2.  *Defendants participated in a pattern of racketeering activities that economically injured the State of New Mexico.*

"Racketeering activity consists of no more and no less than commission of a predicate act." *Sedima*, 473 U.S. at 495.  Section 1961(1) defines both wire and mail fraud as racketeering activities.  Wire fraud is committed by exchanging information through "interstate wire communications to execute 'any scheme or artifice to defraud, or for obtaining money or property by means of false pretenses, representations, or promises.'" *United States v. Baker*, 155 F.4th 1188, 1193 (10th Cir. 2025) (citing 18 U.S.C. §1343).  In allegations for mail fraud, a plaintiff must plead a "material misrepresentation of fact." *Tronsgard v. FBL Fin. Grp., Inc.*, 312 F. Supp.3d 982, 992 (2018).  With the similarities between mail and wire fraud, it is expected that this is required for wire fraud as well.

A "pattern" of racketeering activity "requires at least two acts of the predicate act within ten years of each other." *Johnson v. Heath*, 56 F.4th 851, 858 (10th Cir. 2022).  Beyond this, to be a pattern, the racketeering acts must relate to each other and "amount to a threat of continued racketeering activity." *Id.*  There can be either "closed-ended continuity," which is repeated racketeering activity during a finite period of time, *id.* at 859, or "open-ended continuity," which is racketeering activity that threatens to continue into the future. *Id.*  Open-ended continuity can be established in a variety of ways, including implicit or explicit threats of repetition of the racketeering activity, that the association was created to conduct criminal conduct, or that the predicate acts were the "defendants' regular way of conducting a legitimate enterprise." *Id.*

Defendants committed wire fraud when, from their headquarters in Colorado, Complaint, at ¶¶ 2–3, Defendants used the internet to communicate with, and bill, the State with the intent to financially profit from the misrepresentations made in these communications. *Id.*, at ¶¶ 8, 110–

21

113.    Defendants made material misrepresentations, under State and Federal law, when they unlawfully submitted invoices filled with fraudulent charges to the State via interstate wire communication. *See* Complaint, at ¶¶ 110–115.

Defendants' predicate act, wire fraud, has been pleaded sufficiently to be either a closed-ended or an open-ended pattern, depending on how the Court interprets Defendants' demand letter for $17 million of FEMA-disallowed charges. *See* Jogan Health MTD, **Exhibit A**. In the Complaint, Plaintiffs identified a closed-ended pattern of Defendants' fraudulent billing practices through interstate wire transmissions from October 2021 to March 2022. *See* Complaint, at 3 ("Throughout the period of the Contract . . ."); *id.* ¶ 13 (stating the Contract was entered on October 22, 2021); *id.* ¶ 24 ("Throughout the Contract . . . Defendant Jogan improperly invoiced . . ."), *id.*, at 4 (indicating that "Jogan Health employees were demobilized in New Mexico" in March 2022).

The demand letter sent from Defendants on June 15, 2023, could be the end date of the closed-ended pattern of Defendants' mail and wire fraud, *id.* ¶ 110, as it was the last unlawful electronic or mailed communication sent to the State by Defendants with the intent to profit off of the statutorily fraudulent claim, *id.* at 4, ¶ 8, ¶ 90. However, if viewed in the light of a threat of continued racketeering activity—e.g., a written demand for $17 million of unlawful charges sent interstate with the threat of a lawsuit, or simply the continuation of demand letters, as the alternative—or as a demonstration of how Jogan Health and Dan Dietrich use unlawful invoices to obtain State and Federal funds as their regular way of conducting their enterprise, the demand letter could change the pattern of Defendants' predicate acts to an open-ended pattern. Either way, a pattern of the commission of a predicate act was sufficiently alleged in the Complaint.

      *3. The State adequately alleged an Enterprise.*

To successfully allege a Civil RICO claim, a plaintiff must "allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to as a different name." *Cedric Kushner Promotion, Ltd. v. King*, 533 U.S. 158, 161 (2001). Unlike a normal company employee, when the *president*, and sole owner, of a company "has conducted the corporation's affairs through a forbidden 'pattern'" of racketeering activity, the president and the company are distinct for purposes of RICO. *Id.*, at 160. This makes logical sense because the entire point of creating a business entity separate from oneself is to create the legal distinction between the two. *Id.* at 162.

      Defendant Dan Dietrich is the president, and sole owner, of Jogan Health, LLC. Complaint, ¶ 3. Defendant Dan Dietrich is a "person" for purposes of § 1962(c). *See* § 1961(3); *see also* Complaint ¶ 3. Jogan Health is an LLC, a legal entity organized in the State of Colorado. *Id.* ¶ 2. Jogan Health, as an LLC, or legal entity, is an "enterprise" for purposes of § 1962(c). *See* § 1961(4) (including "legal entity" as one of the definitions of "enterprise"). Defendant Dan Dietrich formed Jogan Health to create a legally separate entity from himself. *Id.* ¶ 6. Defendant Dan Dietrich was responsible for contract compliance and ensuring appropriate oversight over Jogan Health's contracts receiving State and Federal funds. *Id.* ¶ 4. The fact that Defendants operated as an enterprise together, *id.* at ¶ 107, does not change their legally separate identities, which is a "person" legally distinct from the "enterprise." *See Cedric Kushner Promotions, Ltd.* The purpose of Rule 9(b) is to provide Defendants with enough detail to give them "fair notice of the plaintiff's claim and the factual ground upon which it is based." *Farlow*, 956 F.2d at 987. In reading the Complaint as a whole, the Complaint identifies a person and an enterprise, proven the

legal distinction between them, and Defendants, shown by their extensive discussion of the two types of entities and how they come into play, understand the Civil RICO claim and who the State believes participated in it during the Contract period, which is what is required.

4. *The State sufficiently alleged compensable damages under RICO.*

Again, Defendants claim that the State has failed to allege compensable RICO damages because the State, according to Defendants, didn't think the invoices were valid. Again, Defendants fail to explain how, after the State renegotiated the Contract after discovering a fraudulent invoice, it somehow did not rely on Jogan's subsequent invoices. Jogan Health MTD, at 22. As discussed *ad nauseam*, the State had no reason to believe that discussions about the fraudulent invoice, and the signing of Amendment 2 to avoid future similar issues, did not address the State's concern over fraudulent invoices. It was not until after the Contract ended, and the State had received a $17 million demand letter, that the State learned the extent of Defendants' fraudulent invoicing. Complaint, at 3–4. The State was economically harmed by the unlawful invoicing of over $4 million by Defendants, both by paying the unlawful claims, of which the State relied on the accuracy to its detriment, and by being forced to comply with its obligations under FEMA to research Defendants' invoices to confirm adherence to the Contract's terms. *See supra*.

**CONCLUSION**

For the reasons explained above, the Court should deny Defendants' Motion to Dismiss all Claims but Count I and allow discovery to proceed immediately. In the alternative, if the Court would like a more thorough explanation of what the State has been able to identify of Defendants' continued fraud, the Court should grant Plaintiffs the opportunity to amend the Complaint to provide more detail.

DATED: April 13, 2026                    Respectfully submitted,

**ROBLES, RAEL & ANAYA, P.C.**

By:    */s/ Marcus J. Rael, Jr.*
       Marcus J. Rael, Jr.
       Phoebe J.W. Roderick
       500 Marquette Ave. NW, Suite 700
       Albuquerque, NM 87102
       (505) 242-2228
       marcus@roblesrael.com
       phoebe@roblesrael.com

       -and-

       **RAÚL TORREZ**
       **ATTORNEY GENERAL**

       Edward L. Marshall
       Director of Government Litigation
       408 Galisteo Street
       Santa Fe, New Mexico 87501
       (505) 490-4060
       emarshall@nmdoj.gov

       -and-

       **OFFICE OF GENERAL COUNSEL,**
       **New Mexico Department of Health**

       Julie Sakura, General Counsel
       Christopher Woodward, Asst. General
       Counsel
       1190 St. Francis Drive, Suite N4095
       Santa Fe, New Mexico 87502
       julie.sakura@doh.nm.gov
       chris.woodward@doh.nm.gov

       *Counsel for Plaintiff*

25

I hereby certify that on this 13th day of April 2026, the foregoing was electronically served through the CM/ECF system to all counsel of record.


*/s/ Marcus J. Rael, Jr.*
Marcus J. Rael, Jr.